UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DEANGELO MONTEZ TALTON, <br> Defendant. | Case No. 25-20512 <br> Honorable Shalina D. Kumar <br> Magistrate Judge Curtis Ivy, Jr. |

## OPINION AND ORDER GRANTING MOTION TO SUPPRESS FIREARM (ECF NO. 11) AND MOOTING MOTION TO SUPPRESS STATEMENT (ECF NO. 13)

### I.     Introduction

Defendant Deangelo Montez Talton ("Talton") is charged with being a felon in possession of a firearm and moves to suppress both the firearm seized in a pat-down conducted by Genesee County Sheriff Deputy Brandon Fatchting ("Fatching"), and his statement obtained during his subsequent custodial interrogation. ECF Nos. 11, 13. The parties have fully briefed the motion, ECF Nos. 11, 13, 18, 19, and the Court held an evidentiary hearing on November 25, 2025. Following the hearing, the Court ordered supplemental briefing, which the parties submitted and the Court has reviewed. ECF Nos. 22-24. The Court finds this matter is now

ripe for decision. For the reasons below, the Court grants Talton's motion to suppress.

## II.    Factual Background

On May 19, 2025, Deputy Fatching was working his assigned shift at the Genesee County Sheriff's Office paramedic division. At the hearing, Fatching testified that the paramedic division allows law enforcement officers, such as Fatching, who are certified as both a police deputy and licensed paramedic, to work in a dual capacity. That day, Fatching was training a corrections officer, who was then in paramedic school, by taking her along for a supervised ride to observe the actions of a paramedic within the Sheriff's Office. Fatching and the trainee responded to a medical call at the Mass Transportation Authority ("MTA") in Flint "for a male refusing to wake up for MTA staff for him to exit the bus." ECF No. 19-1, PageID.70; *see also* ECF No. 11-1. Fatching's bodycam footage captures the encounter with the unconscious passenger, Talton. Based on that video, Fatching and the other officer arrive at the MTA during daylight hours and grab their medical supplies out of the police cruiser. ECF No. 11-1, at 00:17. Almost immediately after entering the bus where Talton was slouched over a bench, Fatching tells the other officer, "So I pat 'em down before I wake 'em." *Id.* at 1:17-1:18. An MTA employee is standing beside

Talton and relays to Fatching that Talton "smells a little bit like alcohol" but that he "believed [Talton] had a seizure" because Talton was shaking when the employee talked to him a few minutes ago. *Id.* at 1:18-1:27. Fatching proceeded to pat down the outside of Talton's pants and jacket pockets, and within seconds of initiating the pat-down, begins to focus on something in Talton's right-side jacket pocket. *Id.* at 1:27-1:39. Unable to remove the object from the pocket, Fatching uses scissors to cut a hole before removing a firearm. *Id.* at 2:01-2:25. After removing the firearm from Talton's jacket pocket, Fatching tells the other officer, "Case and point. Do not wake any unresponsive up before you fucking search them." *Id.* at 2:26-2:36. Fatching testified that—pursuant to his paramedic training—he would pat unresponsive individuals down to see if weapons were readily accessible to ensure the safety of himself, his partner, and the patient. Talton did not move during this entire pat-down.

Only after Fatching yelled "Hey!" at Talton and touched his chest did Talton wake and sit up. The trainee took Talton's blood pressure and Fatching, now joined by Deputy Jones, inquired into whether Talton possibly violated any CPL laws. *Id.* at 4:00-5:00; ECF No. 19-1, PageID.70. Fatching radioed to run the gun's serial number. Talton refused further medical attention and gave his name to the officers. Upon response from

the radio that the gun was stolen, Fatching put Talton in handcuffs and walked him to the back seat of his patrol car. Fatching entered Talton's information into LIEN/SOS system which revealed that he was on supervised release for a 2022 federal conviction for being a felon in possession of a firearm. ECF No. 19-1, PageID.70; ECF No. 18. PageID.52.

Talton was arrested for being a felon in possession of a firearm and taken to the Genessee County Jail. He was interviewed by Sergeant Duhart of the Genessee County Sheriff's department the next day. The interview was also video recorded. ECF No. 13-1. The interview began with Talton and Duhart recognizing each other from a previous encounter at another jail. The two engaged in friendly conversation and Talton provided Duhart with some basic information for the *Miranda* rights waiver form. *See* ECF No. 13-2.  After Talton confirmed that he was not under the influence of any drugs or alcohol, Duhart read him his *Miranda* rights from the waiver form and asked Talton if it made sense, to which Talton responded "uh-huh." ECF No. 13-1, 3:41-4:11. Talton proceeded to recount his activities from the day before, stating that he was out drinking, fell asleep on the bus, and missed his stop. *Id.* at 4:56-5:22. He further admitted to being on federal parole and buying the gun found on his person for $100 a week

beforehand. 5:47-6:16. On July 9, 2025, Talton was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). ECF No. 8.

Talton now moves to suppress both the firearm obtained from his jacket pocket and his statements to Deputy Duhart, arguing that Fatching lacked reasonable suspicion to conduct the pat-down and that his *Miranda* rights waiver was not knowingly and voluntarily made.

## III.   Analysis

### A. The Fourth Amendment

The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate," are usually deemed "per se unreasonable" for purposes of the Fourth Amendment – "subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993).

A defendant seeking suppression of evidence bears the burden to show "'a violation of some constitutional or statutory right justifying suppression.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th

Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n. 11 (6th

Cir. 1979)). "The exclusionary rule prohibits the admission of evidence

seized in searches and seizures that are deemed unreasonable under the

Fourth Amendment, as well as derivative evidence acquired as a result of

an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir.

1995) (*citing Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

### i. Reasonable Suspicion to Conduct the Pat Down Under *Terry*

Talton moves to suppress the firearm found in his jacket, arguing that

Fatching lacked reasonable suspicion that he was armed and dangerous to

justify a pat-down. He argues that Fatching's frisk was unlawful because it

relied on his personal practice of patting down unconscious individuals

rather than the Fourth Amendment's requirement under *Terry v. Ohio*, 392

U.S.1 (1968). He further argues that no reasonable suspicion existed here

because he remained unconscious throughout the pat-down. ECF No. 11,

PageID.22.

On the other hand, the government argues that the frisk arose out of

legitimate safety concerns. For example, the government asserts that

Fatching reasonably believed that Talton, who was unconscious and

believed to be intoxicated, could have been armed or act erratically once

awoken. Unable to confirm what substance Talton was on based on a

visual inspection, Fatching also reasonably believed that Talton could have had needles or drug paraphernalia on his person that could pose a danger to law enforcement and others on the scene. The government also contends that the high-crime area in which Talton was found, the MTA station in Flint, also justified the reasonableness of Deputy Fatching's pat-down.

The government relies upon the exception to the Fourth Amendment's warrant requirement which permits a police officer to conduct a warrantless, limited pat-down search if the officer has a reasonable and articulable suspicion that the person is "armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24. A "*Terry* frisk" allows an officer to lawfully conduct a search that is "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29. The officer must reasonably believe the individual under investigation "'at close range is armed and presently dangerous to the officer or to others,'" and if so, "the officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon.'" *Dickerson*, 508 U.S. at 373 (quoting *Terry*, 392 U.S. at 24). The court must evaluate the factors upon which the officer actually relied at the time to form a reasonable suspicion that the individual

was armed and dangerous; a finding of reasonable suspicion cannot be based on a factor that the officer did not rely upon when deciding to frisk the individual. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). Reasonable suspicion "requires more than a mere hunch" but "less than probable cause." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008) (citation omitted). In making this evaluation, the court must consider the "totality of the circumstances." *Id.* at 371.

Both parties present the Court with persuasive authority to support their positions. The government relies on *United States v. Broadway*, 968 F.2d 1219 (7th Cir. 1992), where the Seventh Circuit found that the totality of the circumstances warranted a stop and frisk of the defendant. Police officers entered a building known to be a center for gang and drug activities to execute an arrest warrant for a third party. Upon entering the building, the officers found two men laying on the stairs. One of the men, defendant Broadway, did not respond to the officer's questions and was unable to stand up. One of the officers conducted a pat down to ensure Broadway had no weapons on his person after he attempted to reach into his pocket to obtain identification at the officer's request. Cocaine and a firearm were obtained from the pat-down and Broadway later moved to suppress this

evidence. The Seventh Circuit found that the pat-down did not violate

Broadway's Fourth Amendment rights, stating that:

> The questioning of two men passed out on a public stairway seemed appropriate action for a conscientious police officer. The fact that Broadway seemed confused and unsteady, coupled with the officers' experience and knowledge of the area, would reasonably raise the suspicion that Broadway was under the influence of drugs making a pat-down for weapons reasonable and necessary to assure the officer's safety.

*Id.* at *2.

Talton asks the Court to apply the reasoning in *United States v.*

*Gilmore*, 945 F. Supp. 2d 1211 (D. Colo. 2013), *aff'd*, 776 F.3d 765 (10th

Cir. 2015). The officers in *Gilmore* responded to a dispatch report regarding

a suspicious individual who appeared disoriented. The witnesses on the

scene merely pointed out the defendant's location to the officers and noted

he appeared to be intoxicated; they expressed no concern that he posed a

danger beyond his intoxication and unresponsiveness. The court found that

the pat-down search of the defendant was not justified, noting that there

was no indication that the defendant showed any particularized signs of

aggression or hostility despite his apparent intoxication, and "his mere

presence in a high crime area, standing alone, [was] insufficient to

establish reasonable suspicion." *Id.* at *1219–*220 (citing *Brown v. Texas,*

443 U.S. 47, 52 (1979)).

Indeed, the Court acknowledges that case law assessing analogous factual circumstances under the *Terry* frisk analysis is sparse. According to the Court's research on the matter, the parties have provided the cases closest to the issue at hand; that is, whether an officer has reasonable suspicion that an unresponsive individual is armed and dangerous based solely on apparent intoxication and mere presence in a high-crime area.[1] In any event, the totality of the circumstances here do not support a reasonable suspicion that Talton was armed and dangerous. Unlike the defendant in *Broadway*, who did not respond to officer questioning and attempted to reach into his pocket, there is no evidence that Talton—who was unconscious—was uncooperative or made any physical movement that would cause a reasonable officer to believe he was armed and dangerous, or that his safety or that of others was in danger. *See United*

---

[1] Indeed, the likely reason for the lack of precedent is that another exception for the warrant requirement might be a more appropriate fit for the factual circumstances at hand. Lending further credence to this point is *United States v. Gilmore*, 945 F. Supp. 2d 1211 (D. Colo. 2013)—the case cited by Talton. As noted in Talton's reply brief, the court in *Gilmore* "found that the pat down search was justified under an alternative theory, as the officers believed the defendant needed to be taken into protective custody under the state's emergency statute." ECF No. 19, PageID.66 n.2 (citing *Gilmore*, 945 F. Supp. 2d 1220). The court supported its conclusion in part on "Tenth Circuit precedent establishing a community caretaking exception to the warrant requirement that applies in cases of intoxicated individuals." *Gilmore*, 945 F. Supp. 2d at 1221-222.

*States v. Baccus*, 2021 WL 3617104, at *4–5 (S.D. Ohio Aug. 16, 2021) (finding that defendant repeatedly moving his hand close to his waistband "and his presence in an illegally parked car at 2:00 a.m. in a high crime area -- added up to reasonable, articulable suspicion . . . that defendant might have a weapon in the waistband of his paints."). Similarly suspicious movement is wholly lacking here.

Moreover, the time of day and nature of the area do not support a reasonable suspicion determination. While "mere presence in a high crime area is insufficient 'to support a reasonable, particularized suspicion that the person is committing a crime,'" it is "'among the relevant contextual considerations in a *Terry* analysis.'" *Hoover v. Walsh*, 682 F.3d 481, 495 (6th Cir. 2012) (quoting *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000*)*). Likewise, time of day "is relevant without being independently dispositive." *Id*. (citing *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009)). Here, Talton's mere presence in a high-crime area does not constitute sufficient evidence of criminality or dangerousness. Further supporting this point is the fact that this encounter took place in broad daylight, rather than at night.

Lastly, there is no evidence that Talton's suspected intoxication or medical issue warranted a reasonable suspicion that he was armed and

dangerous. The Court sympathizes with Fatching's safety concerns in dealing with people who are unresponsive, intoxicated, and in need of medical assistance. At the hearing, he testified that it is common for people who are under the influence of alcohol, narcotics, or suffering from a medical emergency, to act in a belligerent and combative manner when they return to consciousness. He also testified that in his experience, weapons are also often involved under these circumstances. The record clearly shows that Fatching had reason to believe Talton was either intoxicated or experiencing a medical issue. However, generalized experiences regarding intoxicated and/or unconscious individuals do not show that Fatching had a particularized and reasonable suspicion to believe that Talton might have a weapon. As noted by the court in *Gilmore*, "[a] suspect's intoxication may also contribute to a finding of reasonable suspicion; however, courts treat intoxication as indicative of criminal activity only where intoxication is an element of the suspected crime, or where it is accompanied by other factors that jointly establish reasonable suspicion." 945 F. Supp. 2d at *1218–*19 (citing *United States v. Neff,* 300 F.3d 1217, 1219 (10th Cir. 2002) (reasonable suspicion where officers received a report of an apparently intoxicated man behaving oddly and carrying a gun in a high crime area at 1:40 a.m.); *Gallegos v. City of Colorado Springs,* 114

F.3d 1024, 1029 (10th Cir.1997) (reasonable suspicion where two neighbors reported a "prowler" at 1:00 a.m. "messing with the fence," running down the street, apparently drunk and arguing loudly, and officers observed him crying, talking to himself and smelling of alcohol).

Here, the information available to Fatching about Talton did not indicate that he was armed and dangerous. The evidence clearly shows that the purpose of the dispatch was medical in nature—not an investigation of suspected criminal activity. Indeed, Fatching testified that dispatch did not inform him that Talton was intoxicated, possessed a gun, was involved in a physical altercation, or had otherwise committed a crime. He was solely responding to a medical call. Fatching further stated that there were no visible weapons in Talton's hands or bulging out of his clothing, and Talton remained completely still prior to, and during, the pat-down. The MTA employee, who was with Talton before and during Fatching's arrival, did not report Talton possessing a weapon or any verbal or physical threats. As in *Gilmore*, reasonable suspicion that Talton was armed and dangerous cannot arise where the "Officers' own observations and knowledge about the Defendant," lack "any particularized signs of aggressiveness or hostility" and where third-parties did not "report[] concern for any danger posed by Defendant beyond his intoxication and

lack of responsiveness." 945 F. Supp. 2d at *1219. Without more, evidence of intoxication or unconsciousness is insufficient to provide reasonable suspicion justifying a *Terry* frisk.

Because the government offered no evidence to support Fatching had a reasonable, *particularized* suspicion that Talton was armed and dangerous, the Court finds that the pat-down of Talton was not justified.

The Court further notes that there was no reasonable suspicion to conduct a *Terry* stop in the first place, rendering the frisk unlawful in any event. The Sixth Circuit observed that only "[w]hen an individual is subject to a lawful investigative detention" and only "if the officer has a reasonable suspicion of criminal activity and a reasonable belief that the suspect is armed and dangerous" may "an officer…conduct a limited frisk or pat-down of that person for weapons." *United States v. Brown*, 20 F. App'x 387, 388 (6th Cir. 2001) (citing *Terry*, 392 U.S. at 30). Further, as Talton points out, "[t]he purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Adams v. Williams,* 407 U.S. 143, 146 (1972). But this limited search for weapons for protective purposes is only permitted "[s]o long as the officer is entitled to make a forcible stop, *and* has reason to believe that the suspect is armed and dangerous. *Id.* (emphasis in original). It is only when "an

officer . . . has a reasonable, articulable suspicion that criminal activity is afoot" that the officer "may conduct a brief investigatory stop and may search that individual in the interest of officer safety." *United States v. Jeter*, 721 F.3d 746, 755 (6th Cir. 2013) (citing *Terry*, 392 U.S. at 21-23).

The government does not assert that Fatching had reasonable suspicion to believe that criminal activity was afoot when he was dispatched to the MTA bus station or when he encountered Talton. Nor is the Court persuaded that Fatching had such a suspicion based on the evidence presented. Rather, the evidence, including Fatching's own testimony, clearly shows that the purpose of the dispatch was medical in nature—not an investigation of suspected criminal activity. Without any reasonable suspicion justifying a *Terry* stop, Fatching had no basis for conducting a pat-down of Talton.

### ii.   Emergency-Aid Exception

During the evidentiary hearing on this motion, the Court raised the issue of whether the pat-down was justified under the emergency-aid exception to the Fourth Amendment's warrant requirement and ordered the parties to submit supplemental briefing. ECF Nos. 22-24. The government rightly points out that approaching these circumstances from the traditional *Terry* analysis is challenging, given the importance of ensuring officer and

citizen safety during medical emergencies, and Fatching's dual capacity as a law enforcement officer and licensed paramedic. For these reasons, the Court was open to see if another exception aside from *Terry* would be more appropriate—specifically, the emergency-aid exception.

As previously stated, "warrants are generally required to search a person's home or his person." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). "But sometimes 'the exigencies of the situation'—a health emergency, the risk of destruction of evidence, the risk to officer safety— ma[k]e [a warrantless search] imperative.'" *United States v. Johnson*, 2024 WL 1956209, at *2 (6th Cir. May 3, 2024) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948); (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) and *United States v. Morgan*, 71 F.4th 540, 543 (6th Cir. 2023)).

One recognized exception to the warrant requirement is known as the emergency-aid exception, that is, where a law enforcement officer had "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger[.]" *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (internal quotation marks omitted). *See also Mincey*, 437 U.S. at 392 ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries

and searches when they reasonably believe that a person within is in need of immediate aid.") (footnotes omitted). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Fisher*, 558 U.S. at 47.  It requires only "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger[.]" *Id.* at 49; *see also United States v. Huffman*, 461 F.3d 777, 782–83 (6th Cir. 2006). "And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey*, 437 U.S. at 393. The government bears the burden of proving that exigent circumstances such as a medical emergency existed to justify a warrantless search. *United States v. Bates*, 84 F.3d 790, 794 (6th Cir.1996).

But as Talton points out, neither the Supreme Court nor the Sixth Circuit have directly addressed how this exception might apply to the warrantless searches of *persons* for weapons while a medical emergency is underway. Rather, the exception is used to justify warrantless entry into homes or other protected areas. [2] Thus, it is his position that the

---

[2] *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (Law enforcement "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."); *see also United States v. Black*, 860 F.2d 1080 (6th Cir., Oct. 14, 1988) (Sixth Circuit upheld the search of a defendant's purse under the

warrantless search at issue here is properly assessed under the *Terry* analysis.

The same issue arises regarding the community caretaking exception, which applies "whe[n] ... government actors [are] performing 'community-caretaker' functions rather than traditional law-enforcement functions." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). Unlike other exceptions, it requires that we "look at the *function* performed by a [government agent]" when a search occurs. *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) (emphasis in original). To apply, this function must be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). "[C]ommunity caretaking permits only the use of evidence fully discovered in the course of advancing the caretaking function at hand . . . [and] [t]he scope of any search or seizure must reasonably match its function[.]" *United States v. Morgan*, 71 F.4th 540, 545–46 (6th Cir. 2023) (cleaned up). This exception has been applied to automobile-related contexts, and in limited circumstances, the home. *Id.*

---

emergency-aid exception, where officers were attempting to find identification or medication for the defendant, who was found unconscious on an airplane); *United States v. Dunavan*, 485 F.2d 201, 205 (6th Cir. 1973) (upholding officers' search of defendant's locked *briefcase* for identification and medical information under emergency-aid exception).

But again, this exception does not appear to apply to searches of people, and the Court is not persuaded that it should. Indeed, the Sixth Circuit noted that "the Supreme Court and our court have been careful not to allow this historically grounded, and usually welcome, explanation for police work to overrun core Fourth Amendment protections. Both courts limit its application to the considerations that gave it birth." *United States v. Morgan*, 71 F.4th 540, 545 (6th Cir. 2023).

The government does not cite any caselaw to rebut Talton's arguments. Instead, it asserts that Fatching's dual role—and his actions in his capacity as a paramedic—authorized him to conduct a pat-down of an unresponsive individual before rendering care. The government has not provided, nor can the Court find, authority supporting the position that Fatching's dual role exempts him from *Terry*'s reasonable suspicion requirement or justifies extending another established exception to permit the pat down. After careful consideration, the Court declines to extend any such exception here because the government has not met its burden of demonstrating that one applies. *Mockeridge v. Harvey*, 149 F.4th 826, 835 (6th Cir. 2025) ("The government bears the burden of demonstrating an exception to the warrant requirement.") (cleaned up).

The Court finds that Fatching's pat-down constituted an unlawful search under the Fourth Amendment and the firearm found during that search therefore will be suppressed.

## B. Fruit of the Poisonous Tree

The Court also finds that, because the search violated the Fourth Amendment, all fruits of the search, including Talton's confession regarding the firearm, will be suppressed as well.

Under the exclusionary rule, "evidence seized during an unlawful search [cannot] constitute proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Exclusion applies to "indirect" and "direct" products of the illegal search. *Id.* In addition, the defendant's statements or a confession must be excluded if derived from an illegal search or seizure. *Taylor v. Alabama*, 457 U.S. 687, 689–90 (1982). A post-*Miranda*-warning confession must be suppressed "unless that confession was 'an act of free will [sufficient] to purge the primary taint'" of the Fourth Amendment violation. *Kaupp v. Texas,* 538 U.S. 626, 633 (2003). The government can defeat exclusion of a voluntary statement obtained after an illegal search by arguing that the temporal proximity between the illegal search and the statement, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct favor

admitting the subsequent statements. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

Here, these considerations require suppression of Talton's confession. Sergeant Duhart's observance of *Miranda* prior to questioning weighs against suppression. Talton argues that his statements made to Sergeant Duhart after his arrest should be suppressed because he did not effectively waive his *Miranda* rights.  In support of that argument, he points to the speed at which Sergeant Duhart read Talton his rights and Duhart's failure to "adequately inquire whether Mr. Talton understood those rights" and obtain a signed waiver form despite completing the form himself. ECF No. 13, PageID.32-33. However, even if the Court found that Talton was properly *Mirandized* and knowingly and voluntarily waived his *Miranda* rights, it would be the only factor that favors the government, and compliance with *Miranda* alone is an insufficient basis upon which to find that a confession was purged of the taint of the Fourth Amendment violation. *See Brown,* 422 U.S. at 603 ("the *Miranda* warnings, *alone* and *per se,* cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession.").

The temporal proximity and intervening-circumstances factors weigh heavily in Talton's favor. As the record demonstrates, Fatching arrived on scene the morning of May 19, 2025, conducted the search shortly thereafter, seized the firearm, arrested Talton, and transported him to the Genesee County Jail. Sergeant Duhart interviewed Talton the next morning after he confirmed he was no longer under the influence of alcohol.  A one-day delay between his unlawful arrest and confession, where he remained in custody the entire time and did not talk to a lawyer, favors suppression. *McDaniel v. Polley*, 847 F.3d 887, 894 (7th Cir. 2017) (a 24-hour time gap between defendant's unlawful arrest and his confession did not support a finding of attenuation). Moreover, the record does not show 'any meaningful intervening event' between the illegal [search] and [Defendant's] confession." *Kaupp,* 538 U.S. at 633 (quoting *Taylor v. Alabama,* 457 U.S. 687, 691 (1982)).

Therefore, considering the brief time between the illegal search and the confession and because "there was no intervening event of significance whatsoever," it is clear that Talton's confession arose as a result of the illegal search and his subsequent arrest. *Brown*, 422 U.S. at 604. Talton's confession will be suppressed.

## IV.    Conclusion

For the reasons above, the Court finds that the pat-down of Talton's person violated his Fourth Amendment rights and **GRANTS** Talton's motion to suppress the firearm (ECF No. 11). Likewise, the Court suppresses Talton's statement as fruit of this illegal search. Accordingly, Talton's motion to suppress his statement under *Miranda* is deemed **MOOT.** ECF No. 13.

**IT IS SO ORDERED.**

s/ Shalina D. Kumar
SHALINA D. KUMAR
Dated: January 9, 2026                    United States District Judge